## BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEMEN et al. v. MITCHELL et al.

### No. 13318.

United States Court of Appeals, Fifth Circuit.

July 11, 1951.

James A. Simpson, Birmingham, Ala., Harold C. Heiss, Russell B. Day, Cleveland, Ohio, Ralph M. Hoyt, Milwaukee, Wis., for appellants.

Jerome A. Cooper, William E. Mitch, Hugo L. Black, Jr., F. W. Davies, all of Birmingham, Ala., Charles F. Turner, Mobile, Ala., for appellees.

Before HUTCHESON, Chief Judge, and BORAH and STRUM, Circuit Judges.

JOSEPH C. HUTCHESON, Chief Judge.

Brought by the named plaintiffs, Negro firemen, employees of Gulf, Mobile & Ohio Railroad Company, for themselves and others similarly situated, against the Brotherhood of Locomotive Firemen and Engineers, their statutory bargaining agent, and their employer, the Gulf, Mobile & Ohio Railroad Company, the suit was for injunctive relief and for damages as to negotiations had, and to be had, and contracts made, and to be made, by and between these defendants.

It was broadly based, as other suits against the Brotherhood,[1] brought by other plaintiffs, the employees of other railroads, have been, upon the scriptural pronouncement, "No man can serve two masters, for either he will hate the one and love the other, or else he will hold to the one and despise the other". This is a favored principle at law and in equity.[2] Indeed, it has been stated that in the usual case it is the duty of the agent to further his principal's interests even at the expense of his own in matters connected with the agency.[3] It is the complete disregard of this principle in providing for representation in enacting and administering the Railway Labor Act, 45 U.S.C.A. § 151 et seq., which has been responsible for great contention and difficulty in and out of court.[4]

The claim in general was that the Brotherhood, in its bargaining activities affecting these plaintiffs, had run true to form in serving its members, while disserving plaintiffs, non-members because of their color.

In more detail it was that, in violation of the seniority rights of plaintiffs, particularly by the agreement of July 19, 1947, attached as an exhibit, the defendants discriminating against them solely because of their color, had conspired to deprive plaintiffs of rights and of runs to which they were entitled.

The Brotherhood's defenses, in addition to a motion to dismiss, were a general denial, pleas of limitation and of laches, and pleas: that it had at all times fairly represented plaintiffs without discrimination in favor of its members; that, indeed, the very seniority rights asserted by plaintiffs are, and have been, enjoyed by them and exist

1. Steele v. L. & N. Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Graham v. Brotherhood, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Brotherhood v. Tunstall, 4 Cir., 163 F.2d 289; Rolax v. Atlantic Coast Line, 4 Cir., 186 F.2d 473.

2. 2 Am.Jur., "Agency", Secs. 251-2-3; pp. 202-3-4; 2 Am.Law Institute, Restatement, "Agency", Sec. 393.

3. 2 Am.Jur., p. 204; 2 A.L.I. Restatement.

4. Note 1, supra.

only by virtue of contracts obtained for them by the Brotherhood as their agent; and that, by their suit, plaintiffs are in effect seeking to enjoy these seniority rights without assuming and discharging the burdens which accompany such rights.

The defendant railroad company plead limitation and laches, that it had, as it was required by law to do, dealt with the Brotherhood as the sole bargaining agent, and that, so far as it knew, the Brotherhood had endeavored to represent fairly all members of the craft similarly situated, without regard to color. In addition, it denied: (1) that it had entered into a conspiracy with the Brotherhood; (2) that it had ever made with the Brotherhood any agreement which was intended to, or did, deprive plaintiffs, on account of or by reason of their color, of any of their seniority rights. Finally, as to the part of the Brotherhood proposal of January 26, 1948, by which the distinction between promotable and non-promotable firemen was to be eliminated, and all firemen were to be required to qualify as engineers or be dismissed, the defendant alleged that, since no Negro firemen had ever been, or could be, promoted to engineers, it did not, and would not, agree to that proposal, because it would necessarily result in all the colored firemen losing their jobs.

Thereafter, the cause coming on for trial on the issues joined, the plaintiff did offer the testimony of three of its members as to their personal experience in respect to being prevented from taking runs which they claimed their seniority entitled them to. Their main reliance below and here, however, in effect seemed to be upon the axiom, "Give a dog an ill name and hang him", and their urgent insistence that the earlier cases referred to in note 1, *supra*, though involving different plaintiffs, different railroad companies, and different situations, involved the same brotherhood and had effectively determined and adjudicated all matters in controversy here.

The defendant railroad company, through its witness, V. J. Thompson, Assistant Vice-President in the Operating Department and the contracting officer for the company, whose testimony was not contradicted, or otherwise discredited from any source, gave full, complete and authoritative testimony as to the working conditions on the railroad and, as to negotiations for, and the making of, contracts by and between the railroad and the Brotherhood.

As to the 1940 agreement, under which the company agreed finally, after long resistance to the idea, to place a second man on its diesel passenger engines, provided he was a promotable fireman, he testified that this was not inspired by a desire to discriminate against Negro firemen as such but was a concession demanded by the railroad company in order to obtain something in exchange for putting on the second man, at the urgent insistence of the Brotherhood over the company's vigorous objection thereto.[5]

5. "A. But we on the railroad side felt this way, that we did not need firemen to begin with; if we are going to have to put a man on the left hand side, the way we though we might profit by it, and the only way we thought we might profit by it was to let that fireman work there and observe the operation of the Diesel locomotive, so that in the course of time when he could become an engineer, he would profit by the experience he had had riding with that engine, and in that way we would get some compensation for the work that, or for the payment that we made for the work that he performed.

"Q. In 1940 I believe you identified a contract which was entered into between the Mobile and Ohio and the Brotherhood. Did that contract affect the rights of helpers taken from the ranks of firemen to serve on Diesel locomotives? A. That agreement for the first time gave a right to any firemen to service on the left hand side of the engine cab in a Diesel-electric locomotive.

"Q. In the 1940 agreement, Mr. Thompson, were there any restrictions placed as a class on firemen who should serve on Diesel locomotives? A. The answer is 'Yes, sir'. We did not extend to non-promotable firemen rights to service Diesel-electric locomotives for the reasons which I have already given.

"Q. Mr. Thompson, was the 1940 agreement whereby firemen were limited to promotable men directed to eliminating Negroes from serving on Diesel engines?

Then, after explaining the existence in the service of promotable and non-promotable firemen, white and black, and pointing out that, with the coming of dieselization, it became greatly desirable to have the second man on the diesel locomotive one who was promotable to the position of engineer, he went on to say: that but for the fact that, under the uniform custom prevailing in railroad service, Negro firemen never had been, and never would be, promoted to engineers, he would have favored the complete elimination of non-promotable, and the setting up of one class, promotable, firemen; but that, because of that fact, as dieselization advanced and steam engines were superseded, it became necessary to keep this factor constantly in mind; and the company had, therefore, of its own initiative, endeavored to bring about a modification of the various agreements, with the ultimate result, the contract of July, 1947, the refusal of the company to accede to the Brotherhood's 1948 proposal, and the company's 1948 counter proposition which was in turn rejected by the Brotherhood.

The defendant Brotherhood put on its witnesses: to explain what it had tried to do under the compulsory representation imposed upon it by law; to explain the difficulties caused by the two classifications of promotable and non-promotable firemen, particularly how the non-promotable firemen, white and colored, had, by long seniority, acquired preferential positions without being obligated to advance to the position of engineer; and to particularly deny that, as statutory bargainer, in its representation, it had been unfaithful to its obligations to all, including the plaintiffs.

The evidence in, the district judge filed a lengthy unreported opinion in which, though none of them, except the 1947 agreement, was attacked in the pleadings, canvassing and denouncing as unfair to the plaintiff the various agreements, beginning with the 1924 agreement and including that of September 19, 1940, Nov. 15, 1946, July

10, 1947, and the Brotherhood's attempt in 1948 to negotiate a new contract abolishing the distinctions between promotable and non-promotable firemen, he found: that in all of the agreements from 1924 on, the defendant Brotherhood had, as in the earlier cases cited in note 1, supra, failed to properly represent the plaintiffs; that each and all of the agreements were the results of the unfaithful action of the Brotherhood; and that this discrimination was on account of race or color.

As to the defendant Railroad Company, acquitting it of all charges of conspiracy and of any purpose to discriminate, the district judge particularly approved the testimony as to the 1948 proposal of the Brotherhood, given by Mr. Thompson: "It is our judgment that practically all, if not all, of the non-promotable firemen now in our service would fail to qualify for promotion and consequently would be dismissed from the service. Most of these firemen have been in our service for twenty, thirty, forty years, and to dismiss them now, after this long service, solely because they are not qualified for promotion which they never anticipated, would be an inequity."

In addition, the counter proposal, submitted to the Brotherhood by Mr. Thompson and rejected by it, which would have permitted the Negroes to retain their jobs as firemen and unrestrictedly exercise their seniority with all other firemen and helpers until they reach the age of retirement, had his complete approval as a just settlement of the controversy. He said of it: "Such action by the Brotherhood would have only recognized seniority rights for all members of the craft and might have obviated this litigation".

On the basis of the opinion and of findings of fact substantially in accordance therewith, he entered a judgment restraining the defendant Brotherhood from directly or indirectly requiring or inducing the railroad company to recognize or comply with, and the railroad company from recog-

"Mr. Cooper: I would like to object to that.
"A. It was not.
"Q. In 1940, when this agreement you referred to was executed, was it con-

templated or envisaged by the management that the G. M. & O. Railroad would ever be completely Dieselized? A. No sir, what we had in mind was Diesels on passenger trains."

nizing or complying with, the provisions of the agreement dated May 1, 1924, September 19, 1940, November 15, 1946, and July 19, 1947, insofar as any such provision: (a) requires said railroad to discriminate against these plaintiffs, or against other Negro firemen employed by said railroad, because they are Negroes, or because they are so-called non-promotable employees, or because they are unable to pass examination for engineers; or (b) fails to grant plaintiffs rights based upon continuous service to assignments as firemen on steam locomotives or as helpers on diesel locomotives so long as white firemen are given such rights.

In addition he ordered the Brotherhood to cooperate fully in the maintenance of a non-discriminatory system of job assignments applicable to plaintiffs, and enjoined the railroad company from refusing and failing to grant plaintiffs seniority rights based upon continuous service so long as white firemen are given such rights. He further ordered the Brotherhood, but not the railroad company, to pay to each of plaintiffs the damages sustained by them by loss, because of the action of the Brotherhood, of jobs and preferred runs, and ordered the appointment of a special master to assess such damages.

The Brotherhood alone has appealed.

Here, attack upon the findings and the judgment takes two forms. The first is the earnest insistence that the action is barred by the Alabama Statute of Limitation of One Year. Citing many Alabama cases and the Oklahoma case of Foster v. Walker, 203 Okl. 3, 217 P.2d 533, on the limitation issue, appellant insists that since the suit is not one for an accounting or upon express trust, but one in tort for violation of its obligation as statutory agent of appellees, the suit, though injunctive relief is requested, is in reality a suit at law to which the one year statute applies.

The second is the equally earnest insistence: that, to the extent that the relief sought is not barred, this case was tried and argued below not on the record actually made in this case but on that made in the earlier cases and on the theory, "Give a dog an ill name and hang him", and the maxim, "falsus in uno, falsus in omnibus"; that it presents an entirely different state of facts from that presented in any of the cited cases; and that the evidence here affords no basis for a finding that defendant acted as to these plaintiffs with indifference to their interest or in breach of its fiduciary duty so as to subject it to an injunction or damages.

Appellees' brief, on the issue of limitation, ignores the claim of the suit and the provisions of the decree for damages. It treats the matter before us as involving only the question of appellees' right to equitable relief by injunction. In opposition to the claim that limitation has barred the action, it urges: that the obligation of the defendant Brotherhood, as plaintiffs' statutory agent to represent their interests, was continuous; that limitation, therefore, cannot, and has not, run against its claim for injunctive relief compelling the Brotherhood to discharge its statutory obligation to plaintiffs by correcting any injustices it has caused and by avoiding them in future.

On the merits it insists, as it has done all along, that the action of the Brotherhood in this case runs true to form as a part of the broad general pattern with which the other cases have dealt, the pattern of a fixed determination to first ground the colored firemen and then drive them altogether from the rails.

We have given careful consideration to these respective contentions and the authorities cited in the light thrown upon them by the opinion in the Steele case with its full discussion of the true basis and nature of the action.[6]

6. "* * * the language of the Act to which we have referred, read in the light of the purposes of the Act, expresses the aim of Congress to impose on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them.

"This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in

■ We agree with appellees that the obligation imposed by statute upon defendant to fairly represent the plaintiffs and to actively negotiate and contract in their interest, is a continuing one and that, insofar as the suit undertakes, by a claim for injunctive relief in respect of it, to hold the defendants to the performance of that obligation, limitation does not run against it.

This is bound to be so, because as the right and duty to negotiate is always open, so the right to compel new negotiations to remedy injustice created by, or not dealt with in, prior negotiations, is always open.

■ We agree with appellant, however, that insofar as the suit seeks damages arising out of actions done in violation of that obligation in the past, plaintiffs are cut off by the Alabama Statute of Limitations from claiming damages sustained more than one year prior to the filing of the suit.[7]

This view, limiting plaintiffs' recovery, if any, for damages to matters and things transpiring after and pursuant to the July 19, 1947, contract, renders it unnecessary for us to deal with, or even to consider, appellant's contentions as to the findings of the trial court, that in making the 1924, the 1940, and the 1946 contracts, the defendant failed, to plaintiffs' injury, in its statutory duty toward them.

■ It is sufficient to say that in affirming the judgment to the extent that we do, we do not adopt or approve the opinion or the findings of the trial court as a whole. We adopt and approve them only insofar as they hold: that in the defendant Brotherhood's proposal of January 26, 1948, and in its refusal on March 15, 1948, to accept the defendant railroad company's proposal of February 24, 1948, or some similar plan, the Brotherhood violated its obligation to fairly represent the plaintiffs; and that it should be compelled by injunction to remedy that violation and held responsible in damages resulting therefrom sustained within the one year period of limitation.

The judgment is modified by limiting the damages recoverable to a period subsequent to a date one year prior to the filing of complaint and, as modified, is Affirmed. The appellant to pay all costs of appeal.

---

the terms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied, such as differences in seniority, the type of work performed, the competence and skill with which it is performed, are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit. * * *

"The representative which thus discriminates may be enjoined from so doing, and its members may be enjoined from taking the benefit of such discriminatory action. No more is the Railroad bound by or entitled to take the benefit of a contract which the bargaining representative is prohibited by the statute from making. * * *

" * * * For the present command there is no mode of enforcement other than resort to the courts, whose jurisdiction and duty to afford a remedy for a breach of statutory duty are left unaffected. The right is analogous to the statutory right of employees to require the employer to bargain with the statutory representative of a craft, a right which this Court has enforced and protected by its injunction in Texas & N.

O. R. Co. v. Brotherhood of Railway & S. S. Clerks, supra, 281 U.S. [548 at page] 556–557, 560, 50 .Ct. [427] 429, 430, 74 L.Ed. 1034, and in Virginian R. Co. v. System Federation, supra. 300 U.S. [at page] 548, 57 S.Ct. [592] 599, 81 L. Ed. 789, and like it is one for which there is no available administrative remedy.

"We conclude that the duty which the statute imposes on a union representative of a craft to represent the interests of all its members stands on no different footing and that the statute contemplates resort to the usual judicial remedies of injunction and award of damages when appropriate for breach of that duty." Steele v. L. & N. R. Co., 323 U.S. at pages 202, 203 and 207, 65 S.Ct. at pages 232–234, 89 L.Ed. 173.

7. Code of Alabama, 1940, Title 7, Sec. 26, Limitation of One Year; Blythe v. Enslen, 203 Ala. 692, 85 So. 1; Larue v. C. G. Kershaw Contracting Co., 177 Ala. 441, 59 So. 155; Esslinger v. Spragins, 236 Ala. 508, 183 So. 401; Wynn v. Tallapoosa County Bank, 168 Ala. 469, 53 So. 228; Am.Jur., Vol. 12, at 504; Chambers v. Birmingham Tr & Sav. Co., 232 Ala. 609, 168 So. 893; Spann v. First Nat'l Bank of Montgomery, 240 Ala. 539, 200 So. 554.