R. RICHARDSON, L. Danage, W. North and O. L. Walls, Appellants,

v.

TEXAS AND NEW ORLEANS RAIL-ROAD COMPANY et al., Appellees.

No. 16142.

United States Court of Appeals Fifth Circuit.

March 14, 1957.

Rehearing Denied June 11, 1957.

Joseph C. Waddy, William C. Gardner, Washington, D. C., Roberson L. King, Houston, Tex., for appellants.

George L. Schmidt, Houston, Tex., J. Hart Willis, Dallas, Tex., Wayland K. Sullivan, Cleveland, Ohio, Hugh M. Patterson, John B. Abercrombie, M. L. Null, Houston, Tex., for appellee, Texas and New Orleans Railroad Co., Baker, Botts, Andrews & Shepherd, Houston, Tex., of counsel.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

RIVES, Circuit Judge.

A class action was brought by four Negro employees of the Texas and New Orleans Railroad against the Railroad, the Brotherhood of Railroad Trainmen, and certain of its affiliated lodges and

officers, claiming unlawful perpetuation by contract of an employment practice, discriminatory against plaintiffs and other Negro yardmen of said Railroad, solely because of their race and color.

In substance, the complaint alleges that plaintiffs are Negro yardmen employed by appellee Railroad, who are represented for collective bargaining purposes by the Brotherhood, though they are excluded from membership therein; that they were originally employed by the Houston & Texas Central Railroad, but, upon the merger and consolidation of its operations with those of the Texas & New Orleans Railroad many years ago, all Houston & Texas Central Railroad yardmen affected by the merger were designated "H&TC Protected Men," while all Texas and New Orleans Railroad yardmen were designated as "T&NO Protected Men"; that, during the period since such merger, the "H&TC Protected Men" had become composed exclusively of Negroes, and the "T&NO Protected Men" exclusively of white men; that a custom or practice had existed whereby all Negro "H&TC Protected Men" were permitted to act as engine foremen when the train crew was composed entirely of Negroes, but when it became necessary to designate white "T&NO Protected Men" to serve with an "H&TC Protected" crew, one of the white men served as engine foreman with a higher rate of pay, even when he had less seniority and was no more competent than Negro "H&TC Protected Men" of the same crew; that this pre-existing discriminatory practice was formally perpetuated by the Brotherhood and the Railroad in their September 25, 1952 collective bargaining agreement, by inclusion of the fifth section thereof, as follows:

"5. The present arrangement for filling vacancies for engineer foremen with T&NO yardmen on H& TC Protected crews going on and off duty at the Houston Passenger Station is satisfactory and no change therein will be made under this agreement."

The complaint further alleges that the quoted provision was agreed upon between the Brotherhood and the Railroad without any prior notice to plaintiffs, and without affording them an opportunity to be heard; that both the Railroad and the Brotherhood have since enforced "said illegal agreement and the discriminatory arrangement contracted for therein" to the prejudice of the seniority rights of plaintiffs, and with consequent loss to them of income and retirement benefits; and that, in the making of said agreement, the Brotherhood acted in derogation of its statutory duty under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. to represent plaintiffs fairly and impartially, and used its position as majority bargaining representative under the Act for the purpose of discriminating unfairly against plaintiffs and others of their class. The complaint prays for a declaratory judgment that the agreement and discriminatory practice perpetuated thereby are illegal and void, and "that the action of the Brotherhood and the Railroad Company in entering into and enforcing Section Five (5) of the Agreement * * * is in violation of the Railway Labor Act;" that appellees be enjoined from further enforcement, and "that each plaintiff be awarded $5,000.00 compensatory damages against the Brotherhood and the Railroad Company and * * * $50,000.00 against the Brotherhood as punitive damages," as well as attorneys' fees and costs.

The district court granted appellees' motions to dismiss the complaint for lack of jurisdiction, upon the ground that the complaint seeks adjudication of a dispute between employees and their carrier-employer under Section 3 of the Railway Labor Act, and is a controversy requiring interpretation and application of a collective bargaining agreement cognizable in the first instance by the National Railroad Ad-

justment Board under General Committee v. Missouri-Kansas-Texas R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76, and this Circuit's decision in Conley v. Gibson, 229 F.2d 436, affirming 138 F.Supp. 60, certiorari granted, 352 U.S. 818, 819, 77 S.Ct. 37, 1 L.Ed. 44, and Hampton v. Thompson, 5 Cir., 171 F.2d 535.

Appellants insist that the court's dismissal was incorrect because the facts alleged required the court to assume jurisdiction to redress the discrimination under such decisions as Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Graham v. Brotherhood of Firemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283; the decisions of the Fourth Circuit in Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473, and Dillard v. Chesapeake & O. R. Co., 199 F.2d 948; and this Court's decisions in Brotherhood of Locomotive Firemen v. Mitchell, 190 F.2d 308; and Central of Georgia R. Co. v. Jones, 229 F.2d 648, certiorari denied 352 U.S. 848, 77 S.Ct. 32. Appellants rely particularly upon the Steele Case, supra, as establishing that no interpretation of the application of an existing bargaining agreement justifies relegating such discriminatees to any supposed administrative remedy before the National Railroad Adjustment Board where, as here, the complaint alleges a judically cognizable breach of the bargaining representative's statutory duty not to discriminate against Negro employees of a craft or class represented because of their race or color. They further insist that the district court's reliance upon the General Committee case, supra, was misplaced since that case was decided more than a year before the Steele decision, in which the Supreme Court, with express reference to the General Committee case, held that there was no adequate administrative remedy available to redress discrimination caused by the breach of such statutory duty, and consequently that the failure to apply to the Board for relief does not foreclose judicial inquiry.

The Brotherhood and its affiliated lodges and officers, as appellees, rely upon another line of Supreme Court authority typified by such decisions as Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795,[1] and upon the Ninth Circuit's decision in Hayes v. Union Pacific R. Co., 184 F.2d 337, followed by this circuit in Hettenbaugh v. Air Lines Pilots Ass'n International, 189 F.2d 319, the Hettenbaugh case having been recently followed in the per curiam affirmance of the district court's decision in Conley v. Gibson, supra,—all as supporting their insistence that actions based upon an alleged discriminatory administration and performance of a valid railway bargaining agreement, rather than upon an agreement discriminatory in express terms, are within the exclusive jurisdiction of the Board. The Brotherhood interprets the holdings in the Steele case, supra, and decisions in accord, as authorizing judicial relief "only when collective bargaining agreements are unlawfully entered into or when the agreements themselves are unlawful in terms or effect," as the Ninth Circuit held in the Hayes Case, supra, 184 F.2d at page 338, and insists that those decisions do not charge the federal courts with the duty of policing the impartial administration of agreements between the railroad union and its carrier-employer, which, like Section Five of the contract heretofore quoted, are not discriminatory upon their face. The Brotherhood also urges alternatively that, in so far as the

1. See also Order of Ry. Conductors v. Southern R. Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811; Order of Ry. Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318; cf. Moore v. Illinois Central R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089.

complaint alleges its failure to process appellants' grievances, and fails to aver that appellants have previously sought and been denied relief through timely presentation of their grievances to their carrier-employer and the Board in the manner prescribed by the bargaining agreement,[2] it was subject to dismissal for failure to state a claim upon which relief could be granted.

The Railroad joins in the Brotherhood's main insistence that the Steele, Tunstall, and other Supreme Court decisions relied upon by appellants are not controlling in favor of jurisdiction where, as here, the suit seeks judicial enforcement of an asserted right to the impartial application and administration of a railway bargaining agreement which is not discriminatory per se, a situation which the Railroad urges precipitates a controversy between employees and their carrier-employer requiring interpretation of the bargaining agreement, over which the Board has "exclusive primary jurisdiction" under the Act. Otherwise stated, the Railroad's argument is that, when proof of perpetuation of a pre-existing employment practice and custom must necessarily be adduced to determine whether a bargaining agreement valid in terms is being administered in a discriminatory fashion, the employees complaining of such discriminatory treatment are relegated in the first instance to their administrative remedy under the General Committee and Pitney Cases, supra, especially since the complaint here contains no allegations that appellants have been deprived by their bargaining representative of any pre-existing "vested employment rights," as was the situation in the Steele and Tunstall cases, supra, but the complaint simply avers perpetuation prospectively by agreement of a long-existent employment practice and custom. The Rail-

road further joins in the Brotherhood's alternative insistence that the action was improvidently brought, absent any allegation that appellants first sought redress through negotiation, conciliation, or prior resort to their supposed administrative remedy before the Board. The Railroad further urges, solely in its own behalf, our re-consideration of the decision of a majority of that panel of this Circuit which rendered the per curiam affirmance in Central of Georgia R. Co. v. Jones, 229 F.2d 648, certiorari denied 352 U.S. 848, 77 S.Ct. 32, in so far as the Railroad was held jointly liable with the Brotherhood for damages for breach of the latter's implied statutory duty not to discriminate, it being urged that the dissenting view in the Jones case, supra, correctly states the law, and that in such situations the carrier can, at most, be enjoined prospectively from enforcing such agreement or negotiating any future agreements with the Brotherhood found discriminatory and unlawful.

With the material allegations of the complaint set forth, with the contentions so framed, and practically all of the authorities of major pertinence cited and read, the jurisdictional issue seems to us clear. We think the allegations of the complaint bring it within the rationale of the Steele decision, rather than the rule of the General Committee case, upon which the district court mainly relied. Notwithstanding the Railroad's contrary insistence, it seems to us that the real distinction differentiating this type controversy from that under consideration by the Court in such cases as General Committee, Slocum, and Pitney is that those decisions involved "jurisdictional disputes" between rival unions as to their representation authority, and the rule requiring prior exhaustion of the administrative remedy was there in-

2. The agreement between the Railroad and the Brotherhood provides in pertinent part as follows:

"Yardmen having grievances will present them within ninety days from the date they are first aggrieved. In the event of their failure to do so, their rights to make complaints shall cease. * * * This Article not to apply to seniority lists."

voked because the Court apparently felt that the resolution of that type dispute, non-existent here, was peculiarly within the competence of the Adjustment Board. However, even assuming an adequate administrative remedy to redress the discrimination here alleged, the rule of General Committee and Slocum, supra, is not applicable to foreclose judicial relief upon such allegations of a breach of the statutory representatives' implied duty to bargain impartially for the benefit of all members of the craft represented, without discrimination because of their race or color. That was clearly implied by Mr. Chief Justice Stone in his subsequent opinion for the Court in Steele, supra, 323 U.S. at pages 204–205, 65 S.Ct. at pages 232–233.

. While it is true that Section Five of the bargaining agreement, read in isolation and out of context from other portions of the complaint, is not discriminatory upon its face, the surrounding provable facts and circumstances make it discriminatory, and the complaint read as a whole charges essentially that same unlawful breach of the bargaining representatives' implied statutory duty of impartial representation held actionable by the Court in the Steele and Tunstall decisions. Here, as in Steele, the allegations of the complaint require no interpretation or administrative application of the bargaining agreement within the special competence of the Adjustment Board, which forecloses judicial relief under Section 3 of the Act. Indeed, it appears to us that Section 3 is not applicable to justify relegating the parties to any supposed administrative remedy before the Board where, as here, the main cause of action is alleged against the bargaining representative, to which the dispute between the employees and their carrier-employer is subordinate and ancillary. But, whether this be true or not, we adhere to our conclusion that jurisdiction over such a controversy exists, irrespective of whether the representatives' breach of its statutory duty involves a deprivation of

so-called "vested employment rights" under a bargaining agreement discriminatory in express terms, as in Steele, or results, as here, from perpetuation prospectively by a bargaining agreement possibly valid upon its face of a pre-existing discriminatory employment practice. In either event, an actionable breach of the bargaining union's statutory duty rendered the complaint justiciable under the Steele case results, the particular form of enforcement of such discrimination being only a matter of proof. Any other rule would permit a bargaining union and its railroad-employer to practice or perpetuate jointly, through custom and under an agreement innocuous in terms, that very abuse of the bargaining representatives' power of representation directly proscribed by the Steele and Tunstall decisions.

 Whatever implications may be drawn from this Court's previous decisions in Conley v. Gibson, in which certiorari has recently been granted, and Hampton v. Thompson, our re-examination of the jurisdictional issue convinces us that the absence of any allegation as to the existence of a bargaining agreement discriminatory upon its face is not determinative, and does not foreclose judicial inquiry where the complaint seeks redress for discriminatory representation in violation of the bargaining union's implied statutory obligation to bargain impartially for all, and neither seeks nor requires any administrative inquiry into the fair administration of a bargaining agreement valid in terms. Adoption of this view by the Supreme Court in the Gibson case, would, of course, be dispositive of this same issue here; but, even if the Court affirms the Gibson case on this point, it seems to us that the allegations of this complaint would still support jurisdiction under the Steele decision and our recent decision in Central of Georgia R. Co. v. Jones.

We have also carefully considered the Railroad's alternative insistence that nothing more than injunctive relief may

be inforced against it, and that in no event may it be held liable for damages for any subsequently proven breach of the Brotherhood's statutory duty not to discriminate. This is simply a renewal of the identical argument recently rejected without comment by a majority of the panel which decided Central of Georgia R. Co. v. Jones. Notwithstanding this fact, we have re-appraised the problem in the light of the Railroad's arguments and the dissent in the Jones case, but, for reasons hereafter stated, we are still unpersuaded from our tacit holding in Jones that the Railroad is jointly liable in damages along with the Brotherhood.

True, the Congress has not enacted any so-called Fair Employment Practices Code preventing the Railroad, of its own volition, from discriminating solely on account of race or color. It has, however, imposed directly upon the Railroads the duty to "make and maintain agreements" in compliance with the provisions of the Railway Labor Act, the first paragraph of Section 2 of that Act, 45 U.S.C.A. § 152 providing:

> "First. *It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements* concerning rates of pay, rules, and working conditions, and

to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." (Emphasis supplied.)

 Further, the Railroad, in entering into the contract, was charged with knowledge that the Brotherhood as the statutory representative of its employees was under a duty to represent all employees for whom it acted fairly, impartially, in good faith and without hostile discrimination. Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 203–204, 207, 65 S.Ct. 226, 89 L.Ed. 173; Rolax v. Atlantic Coast Line R. Co., supra; Dillard v. Chesapeake & O. R. Co., supra; Central of Georgia R. Co. v. Jones, supra. Cf. the dissenting opinion in Syres v. Oil Workers International Union, 5 Cir., 223 F.2d 739, 745, reversed 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785.[3]

The contract should be read as if the void discriminatory provision did not exist. It then becomes clear that the Railroad has deprived the Negro yardmen of job assignments and pay to which they were entitled by other provisions of the contract.[4]

---

**3.** In an analogous situation under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., the Supreme Court said:

"The company, it is said, bargained with Independent because it was compelled to do so by law. The union shop contract to which the company at first objected, but into which it entered against the advice of counsel, was the result of that bargaining. The company, it is pointed out, persistently though unsuccessfully sought to persuade Independent to admit C.I.O. workers as members of Independent. Hence, we are told, the company did all in its power to prevent the discharges and should not be held responsible for them. Two answers suggest themselves: First, that the company was not compelled by law to enter into a contract under which it knew that discriminatory discharges of its employees were

bound to occur; second, the record discloses that there was more the company could and should have done to prevent these discriminatory discharges even after the contract was executed." Wallace Corp. v. National Labor Relations Board, 323 U.S. 248, 256–257, 65 S.Ct. 238, 242, 89 L.Ed. 216.

**4.** For example, Sections 2 and 3, as follows:

"2. When an extra yard engine is called the senior yardman on hand at starting time who has registered his desire to work as extra engine foreman and whose regular job as a helper has the same starting time and on-duty location as the extra engine called, will be used as engine foreman, and as between extra men called for extra yard engine, seniority will govern in filling vacancies

"The void and discriminatory agreement which it entered into with the Brotherhood will no more protect it than it will protect the Brotherhood from liability for the loss occasioned to those who were injured thereby." Rolax v. Atlantic Coast Line R. Co., 186 F.2d at pages 480–481.

■ It takes two parties to reach an agreement, and both have a legal obligation not to make or enforce an agreement or discriminatory employment practice which they either know, or should know, is unlawful. Unless financial responsibility for a joint breach of such duty is required from both sides of the bargaining table, the statutory policy implied under Steele will be impracticable of enforcement. For the foregoing reasons, we think the Brotherhood's obligation under the statute does not exist in vacuo, unsupported by any commensurate duty on the part of the carrier.

■ The Railroad may not have been the Brotherhood's keeper for bargaining purposes, but we think that, under the allegations of this complaint, it can be required to respond in damages for breach of its own duty not to join in causing or perpetuating a violation of the Act and that policy which it is supposed to effectuate.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with the views expressed in this opinion.

Reversed and remanded.

on the extra yard engine and the vacancy for helper in place of regular helper used as foreman. If there are no regular helpers who have registered to work as extra engine foreman, the senior regular helper on hand at the same starting time and on-duty location qualified and willing to work as foreman will be used, and if there is not a regular helper who has registered to work as engine foreman or a regular helper qualified and willing to work as engine foreman, as provided for herein, the senior extra yardman called for the extra engine will be used as engine foreman.

"3. In filling vacancies as engine foreman on regular yard engines, a regular helper on that crew will be used; the senior regular helper to have preference. Should a vacancy exist on his regular crew for foreman, a regular helper who has registered for service as extra engine foreman will have the choice of working as foreman of the extra engine, or as foreman on his regular engine if no helper senior to him on that crew desires the vacancy."